# EXHIBIT B

# CIVIL INTAKE
# SHEET

**CIVIL ACTION NUMBER:** CL- 2019 02911

**HOW RECEIVED:** COUNTER

**JUDGMENT AMOUNT:** $ 50,000,000 +

**FILING FEE:** $ 346 CHECK ✓ CASH ____ MO ____ CREDIT CARD ____

**CREDIT CARD FEE:** $ _____

**TOTAL AMOUNT:** $ 346

**CLERKS INITIALS:** ____ m

**VS-4 FORM:** YES ____ NO ____

**ID Presented (CWP):** _____

**SERVICE TYPE:**

SHERIFF: _____   SPS: ✓
OPUB: _____   RM: _____
   CM: _____
SOC: ____ DMV: ____ SCC: _____

**SHERIFF**          **AMOUNT**

**SPECIAL INSTRUCTIONS:**

**CERTIFIED COPIES:** _____

Defamation

# FINAL DISPOSITION

Fiduciary #: _____

2 0 1 9   0 2 9 1 1

Case #: CL-_____-_____

| DEFENDANTS | Date Final | | | Final Order #1 | Final Order #2 | Final Order #3 | Final Order #4 |
|---|---|---|---|---|---|---|---|
| 1. | | TRIAL-JURY | (TJ) | | | | |
| 2. | | TRIAL-JUDGE w/WITNESS | (TNJ) | | | | |
| 3. | | DEFAULT JUDGMENT | (DJ) | | | | |
| 4. | | SETTLEMENT | (SETL) | | | | |
| 5. | | NONSUIT | (NS) | | | | |
| 6. | | VOLUNTARY DISMISSAL | (DIS) | | | | |
| 7. | | DECREE ON DEPOSITION | (DD) | | | | |
| 8. | | REPORT BY COMMISSIONER | (FDCR) | | | | |
| Other Comments: | | OTHER – | (FO) (SJ) (FD) | | | | |
| | | GARNISHMENT | | | | | |
| | | CONCEALED WEAPON PERMIT | | | | | |
| | | APPT CHURCH TRUSTEES/Substitute FID | | | | | |
| | | NAME CHANGE | | | | | |
| | | PURGED AFTER 2 YEARS | (2YO) | | | | |
| | | PURGED AFTER 3 YEARS | (3YO) | | | | |
| E.H. Date:_____ | | | | | | | |
| E.H. Date:_____ | | | | | | | |

| | TRIAL DATE | NUMBER OF JURY DAYS | FINAL ALL DEFENDANTS | CLERK'S OFFICE |
|---|---|---|---|---|
| 1. | | | | |

| | RE-OPEN DATE | REMAND (REM) REINSTATE (REI) MISTRIAL (MIS) | MOTION TYPE | RE-CLOSE DATE | CLERK'S OFFICE |
|---|---|---|---|---|---|
| 2. | | | | | |
| 3. | | | | | |
| 4. | | | | | |

**FAIRFAX CIRCUIT COURT**
**CIVIL CASE COVERSHEET**

2019  02911

**Parties:**

| Plaintiffs | Defendants |
|---|---|
| 1. John C. Depp II | 1. Amber Laura Heard |
| 2. | 2. |
| 3. | 3. |

**\*Plaintiff proceeding without Counsel – Address and Daytime Phone Number required on Complaint**

**Plaintiff Attorney:**

Name: Benjamin G. Chew                     Bar ID: 29113

Firm: Brown Rudnick LLP

Street: 601 13th Street, NW, Suite 600

City: Washington          State: DC          Zip: 20005

Phone Number: 202-536-1785          Fax Number: 202-536-1701

E-mail Address: bchew@brownrudnick.com

FILED
CIVIL INTAKE
2019 MAR -1  PM 12: 46
JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

**Nature of Complaint** (Check only one)          **\* Cases in the Civil Tracking Program**

| | | |
|---|---|---|
| Administrative Appeal | ✔ Defamation * | Malpractice – Medical * |
| Affirmation of Marriage | Delinquent Taxes * | Mechanics/Vendors Lien * |
| Aid & Guidance | Eminent Domain | Partition * |
| Appeal Decision of Board of Zoning | Encumber/Sell Real Estate | Personal Injury – Assault * |
| Appeal of Process/Judicial Appeal | Erroneous Assessments | Personal Injury – Auto * |
| Appointment Church/Organization Trustees | Expungement | Personal Injury – Emotional * |
| Arbitration | False Arrest/Imprisonment* | Personal Injury – Premises Liability* |
| Attachment | Fiduciary/Estate Complaint | Property Damage* |
| Complaint – Equity  * | Garnishment–Federal–180 days | Products Liability* |
| Complaint – Legal Cause of Action * | Garnishment–Wage–180 days | Quiet Title * |
| Compromise Settlement | Garnishment–Other – 90 days | Real Estate * |
| Condemnation* | Guardian/Conservator Adult | Restoration of Driving Privilege |
| Confession of Judgment | Guardianship/Minor | Vital Record Correction |
| Construction  * | Injunction | Writ Habeas Corpus |
| Contract * | Interpleader | Writ Mandamus |
| Conversion* | Insurance * | Wrongful Death* |
| Court Satisfaction of Judgment | Judicial Review | Wrongful Discharge * |
| Declare Death | Malicious Prosecution * | **OTHER:** |
| Declaratory Judgment * | Malpractice – Legal * | |

Damages in the amount of $ 50,000,000 and punitives are claimed.

**Requested Service:** Sheriff☐ Private Process Server☐ ✔DMV☐ Secretary of Commonwealth☐
State Corporation Commission☐ Publication☐ No Service at this time☐

VIRGINIA:

IN THE CIRCUIT COURT OF FAIRFAX COUNTY

FILED
CIVIL INTAKE

2019 MAR -1 PM 12: 45

JOHN T. FREY
CLERK, CIRCUIT COURT
FAIRFAX, VA

| | | |
|---|---|---|
| John C. Depp, II, | ) | |
| | ) | |
| **Plaintiff,** | ) | Civil Action No. 2019 02911 |
| v. | ) | |
| | ) | |
| Amber Laura Heard, | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

Plaintiff John C. Depp, II, a/k/a Johnny Depp, in support of his Complaint against Defendant Amber Laura Heard hereby states the following:

### NATURE OF THE ACTION

1.      This defamation action arises from an op-ed published in the *Washington Post* by actress Amber Heard ("Ms. Heard").  In the op-ed, Ms. Heard purported to write from the perspective of "a public figure representing domestic abuse" and claimed that she "felt the full force of our culture's wrath for women who speak out" when she "spoke up against sexual violence."

2.      Although she never identified him by name, the op-ed plainly was about (and other media consistently characterized it as being about) Ms. Heard's purported victimization after she publicly accused her former husband, Johnny Depp ("Mr. Depp"), of domestic abuse in 2016, when she appeared in court with an apparently battered face and obtained a temporary restraining order against Mr. Depp on May 27, 2016.  The op-ed depended on the central premise that Ms. Heard was a domestic abuse victim and that Mr. Depp perpetrated domestic violence against her.

Exhibit C - 005

3.     The op-ed's clear implication that Mr. Depp is a domestic abuser is categorically and demonstrably false.  Mr. Depp never abused Ms. Heard.  Her allegations against him were false when they were made in 2016.  They were part of an elaborate hoax to generate positive publicity for Ms. Heard and advance her career.  Ms. Heard's false allegations against Mr. Depp have been conclusively refuted by two separate responding police officers, a litany of neutral third-party witnesses, and 87 newly obtained surveillance camera videos.   With a prior arrest for violent domestic abuse and having confessed under oath to a series of violent attacks on Mr. Depp, Ms. Heard is not a victim of domestic abuse; she is a perpetrator.  Ms. Heard violently abused Mr. Depp, just as she was caught and arrested for violently abusing her former domestic partner.

4.     Ms. Heard's implication in her op-ed that Mr. Depp is a domestic abuser is not only demonstrably false, it is defamatory *per se*.  Ms. Heard falsely implied that Mr. Depp was guilty of domestic violence, which is a crime involving moral turpitude.  Moreover, Ms. Heard's false implication prejudiced Mr. Depp in his career as a film actor and incalculably (and immediately) damaged his reputation as a public figure.

5.     Unsurprisingly, Mr. Depp's reputation and career were devastated when Ms. Heard first accused him of domestic violence on May 27, 2016.  Ms. Heard's hoax allegations were timed to coincide with the day that Mr. Depp's film, *Alice Through the Looking Glass*, was released in theatres.  Her op-ed, with its false implication that she was a victim of domestic violence at the hands of Mr. Depp, brought new damage to Mr. Depp's reputation and career.  Mr. Depp lost movie roles and faced public scorn.  Ms. Heard, an actress herself, knew precisely the effect that her op-ed would have on Mr. Depp.  And indeed, just four days after Ms. Heard's op-ed was first published on December 18, 2018, Disney announced on December 22, 2018 that

2

Exhibit C - 006

it was dropping Mr. Depp from his leading role as Captain Jack Sparrow—a role that he created—in the multi-billion-dollar-earning *Pirates of the Caribbean* franchise.

6. Ms. Heard published her op-ed with actual malice. She knew that Mr. Depp did not abuse her and that the domestic abuse allegations that she made against him in 2016 were false. She knew that the testimony and photographic "evidence" that she presented to the court and the supporting sworn testimony provided by her two friends were false and perjurious. Ms. Heard knew that the truth was that she violently abused Mr. Depp—just as she violently abused her prior domestic partner, which led to her arrest and booking for domestic violence, as well as a night in jail and a mug shot. Ms. Heard revived her false allegations against Mr. Depp in the op-ed to generate positive publicity for herself and to promote her new movie *Aquaman*, which premiered across the United States and in Virginia only three days after the op-ed was first published.

7. Mr. Depp brings this defamation action to clear his name. By this civil lawsuit, Mr. Depp seeks to restore his reputation and establish Ms. Heard's legal liability for continuing her campaign to push a false narrative that he committed domestic violence against her. Mr. Depp seeks an award of compensatory damages for the reputational harm that he suffered as a result of Ms. Heard's op-ed, with its false and defamatory implication that Mr. Depp was a domestic abuser. Further, given the willfulness and maliciousness that Ms. Heard demonstrated when she knowingly published the op-ed with the false implication that Mr. Depp violently abused her, Mr. Depp also seeks an award of punitive damages.

## PARTIES

8. Plaintiff John C. Depp is an individual and a resident of the State of California. For decades, he has been one of the most prominent actors in Hollywood. Mr. Depp was married

3

Exhibit C - 007

to Ms. Heard for approximately 15 months between February 1, 2015 and May 23, 2016. They had no children together. Mr. Depp was the target of Ms. Heard's false and defamatory op-ed in the *Washington Post*.

9. Defendant Amber Laura Heard is an individual and a resident of the State of California. Ms. Heard is an actress and Mr. Depp's former wife. Ms. Heard authored and published the defamatory op-ed in the *Washington Post* that falsely implied that Mr. Depp abused her during their marriage.

## JURISDICTION AND VENUE

10. This Court has specific personal jurisdiction over Defendant under Virginia's long-arm statute, Va. Code § 8.01-328.1, as well as under the Due Process Clause of the U.S. Constitution, because, among other things, the causes of action in this Complaint arise from Defendant transacting business in this Commonwealth and causing tortious injury by an act or omission in this Commonwealth. Moreover, exercising jurisdiction would not offend traditional notions of fair play and substantial justice because Defendant could have — indeed should have — reasonably foreseen being haled into a Virginia court to account for her false and defamatory op-ed which was published: in a newspaper that is printed in Springfield, Virginia; in an online edition of the newspaper that is created on a digital platform in Virginia and routed through servers in Virginia; in a newspaper that has wide circulation in Virginia and even publishes a Virginia local edition in which the false and defamatory op-ed appeared; and in a newspaper that maintains two physical offices in Virginia. Further, Defendant published the false and defamatory op-ed to promote her new movie which was in Virginia theatres for viewing by Virginia audiences.

4

Exhibit C - 008

11.     Venue is proper in this circuit under Va. Code § 8.01-262 because the causes of action asserted herein arose in this Circuit.

## FACTS

**Ms. Heard Wrote An Op-Ed In The *Washington Post* That Implies That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp**

12.     Mr. Depp has appeared in more than 50 films over the last three decades.  He has worldwide name recognition and has played a diverse array of iconic roles, including Edward Scissorhands, Willy Wonka, Captain Jack Sparrow, The Mad Hatter, Grindelwald, John Dellinger, and Whitey Bulger.  His movies have grossed over $10 billion dollars in the United States and around the world.  He has won the People's Choice Award 14 times.

13.     Mr. Depp married Ms. Heard on February 1, 2015.  The two met when Ms. Heard was cast in Mr. Depp's film *The Rum Diary*.

14.     The marriage lasted only 15 months.

15.     Unbeknownst to Mr. Depp, no later than one month after his marriage to Ms. Heard, she was spending time in a new relationship with Tesla and Space-X founder, Elon Musk. Only one calendar month after Mr. Depp and Ms. Heard were married—while Mr. Depp was out of the country filming in March 2015—Eastern Columbia Building personnel testified that Ms. Heard received Musk "late at night" at Mr. Depp's penthouse.  Specifically, Ms. Heard asked staff at the Eastern Columbia Building to give her "friend Elon" access to the building's parking garage and the penthouse elevator "late at night," and they testified that they did so.  Building staff would then see Ms. Heard's "friend Elon" leaving the building the next morning.  Musk's first appearance in Mr. Depp's penthouse occurred shortly after Ms. Heard threw a vodka bottle at Mr. Depp in Australia, when she learned  that Mr. Depp wanted the couple to enter into a post-

Exhibit C - 009

nuptial agreement concerning assets in their marriage. Ms. Heard's violently aimed projectile virtually severed Mr. Depp's middle finger on his right hand and shattered the bones.

16.     Mr. Depp's marriage to Ms. Heard came to an end in May 2016. After Mr. Depp indicated to Ms. Heard that he wanted to leave the marriage, Ms. Heard lured Mr. Depp to his penthouse to pick up his personal items. Unaware that members of Mr. Depp's security team (including an 18-year veteran of the Los Angeles County Sherriff's Department) were mere feet away, Ms. Heard falsely began yelling "stop hitting me Johnny." The interaction culminated with Ms. Heard making false allegations that Mr. Depp struck her with a cell phone, hit her, and destroyed the penthouse. There were multiple eyewitnesses to this hoax. Ms. Heard's friend then called the police, who arrived promptly. Upon their arrival, Ms. Heard refused to cooperate with police or make any claims that she had been injured or assaulted, and two domestic abuse trained police officers testified that after close inspection of Ms. Heard and the penthouses, they observed no injury to Ms. Heard or damage to the penthouses. But then, six days later, Ms. Heard presented herself to the world with a battered face as she publicly and falsely accused Mr. Depp of domestic violence and obtained a restraining order against him, based on false testimony that she and her friends provided.

17.     Now there are newly obtained surveillance camera videos, depositions, and other evidence that conclusively disprove Ms. Heard's false allegations. Although much of this exculpatory evidence was collected by certain members Mr. Depp's then-legal team in 2016, it only recently came into Mr. Depp's possession, as it had been hidden from him for a period of years.

18.     Ms. Heard later withdrew her false domestic violence allegations and dismissed the restraining order. She and Mr. Depp finalized their divorce in January 2017.

Exhibit C - 010

19.     Despite dismissing the restraining order and withdrawing the domestic abuse allegations, Ms. Heard (and her surrogates) have continuously and repeatedly referred to her in publications, public service announcements, social media postings, speeches, and interviews as a victim of domestic violence, and a "survivor," always with the clear implication that Mr. Depp was her supposed abuser.

20.     Most recently, in December 2018, Ms. Heard published an op-ed in the *Washington Post* that falsely implied that Ms. Heard was a victim of domestic violence at the hands of Mr. Depp.   The op-ed was first published on the *Washington Post's* website on December 18, 2018 with the title, "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath.  This has to change."  The op-ed appeared again on December 19, 2018 in the *Washington Post's* hardcopy edition under the title, "A Transformative Moment For Women."   Except for their titles, the online and hard copy versions of the op-ed were substantively identical and are referred to collectively herein as the "Sexual Violence" op-ed.

21.     The "Sexual Violence" op-ed's central thesis was that Ms. Heard was a victim of domestic violence and faced personal and professional repercussions because she "spoke up" against "sexual violence" by "a powerful man."

22.     Although Mr. Depp was never identified by name in the "Sexual Violence" op-ed, Ms. Heard makes clear, based on the foundations of the false accusations that she made against Mr. Depp in court filings and subsequently reiterated in the press for years, that she was talking about Mr. Depp and the domestic abuse allegations that she made against him in May 2016.  Ms. Heard wrote:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

7

Exhibit C - 011

- "Then two years ago [the precise time frame of her allegations against and divorce from Mr. Depp], I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

23.     As these statements reflect, the whole op-ed proceeds from the notion—presented as an unassailable truth—that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp. She was not. Ms. Heard is not a victim of domestic violence, and Mr. Depp is not a perpetrator of domestic violence. And the centerpiece of Ms. Heard's attention-seeking hoax— her claim that Mr. Depp savagely injured her face by throwing her own iPhone at her from point blank range as hard as he could and then continued to beat her face with other "appendages of his body" on the evening of May 21, 2016, which caused her to have the battered face that she first presented to the court and the world on May 27, 2016—was a poorly executed lie that nevertheless has endured for nearly three years. The statements in her "Sexual Violence" op-ed that imply otherwise are false and defamatory.

**Ms. Heard Was Not A Victim Of Domestic Violence: She Was A Perpetrator**

24.     Long before Ms. Heard became a self-described "public figure representing domestic abuse" based on her false domestic violence allegations against Mr. Depp, Ms. Heard was in an abusive relationship. But Ms. Heard was not the victim in that relationship. She was the abuser.

Exhibit C - 012

25.     On September 14, 2009, police officers at the Seattle-Tacoma International Airport witnessed Ms. Heard physically assault her then-domestic partner, Tasya van Ree. Ms. Heard grabbed Ms. van Ree by the arm, hit Ms. van Ree in the arm, and yanked Ms. van Ree's necklace off her neck. Ms. Heard was arrested. She was booked for misdemeanor domestic violence, a mug shot was taken of her, and she spent the night in jail. The following day, the Seattle-based prosecutor declined to press charges against Ms. Heard, but only because both she and her domestic abuse victim were California residents who were merely passing through Washington state.

26.     Since casting herself as a domestic abuse victim, Ms. Heard has attempted to blame misogyny and homophobia for her domestic violence arrest—claiming that she was arrested "on a trumped up charge" because she was in a same-sex relationship. In truth, the police officer who arrested Ms. Heard for domestic violence was both a woman and a lesbian activist, who publicly said so after she was publicly disparaged by Ms. Heard.

27.     Ms. Heard's violent domestic abuse did not end when her relationship with Ms. van Ree ended. Ms. Heard committed multiple acts of domestic violence against Mr. Depp during their marriage. Ms. Heard's physical abuse of Mr. Depp is documented by eyewitness accounts, photographs, and even Ms. Heard's own admissions under oath.

28.     In one particularly gruesome episode that occurred only one month into their marriage, Ms. Heard shattered the bones in the tip of Mr. Depp's right middle finger, almost completely cutting it off. Ms. Heard threw a glass vodka bottle at Mr. Depp—one of many projectiles that she launched at him in this and other instances. The bottle shattered as it came into contact with Mr. Depp's hand, and the broken glass and impact severed and shattered Mr.

Exhibit C - 013

Depp's finger.  Mr. Depp's finger had to be surgically reattached.  Ms. Heard then disseminated false accounts of this incident, casting Mr. Depp as the perpetrator of his own injury.

29.     Ms. Heard's domestic abuse of Mr. Depp continued unabated throughout their 15-month marriage. Ms. Heard threw dangerous objects at Mr. Depp, and also kicked and punched him with regularity.

30.     Shockingly, Ms. Heard even has used one of her attacks on Mr. Depp to push her false narrative that she is a domestic abuse victim.  In her false affidavit to obtain a restraining order against Mr. Depp, Ms. Heard recounted a domestic violence incident that occurred between her and Mr. Depp on April 21, 2016 and reversed the roles, claiming that she was the victim when in truth she was the perpetrator.  Ms. Heard falsely claimed that Mr. Depp physically attacked her, threw glasses at her, and broke a champagne bottle in their penthouse after her thirtieth birthday celebration on April 21, 2016.  In truth, Ms. Heard—angry with Mr. Depp because he was late to her birthday celebration due to a business meeting — punched Mr. Depp twice in the face as he lay in bed reading, forcing him to flee their penthouse to avoid further domestic violence at the hands of Ms. Heard.  Mr. Depp's security detail member, Sean Bett (an 18-year veteran of the Los Angeles County Sherriff's Department) picked up Mr. Depp immediately after Ms. Heard assaulted him and witnessed firsthand the aftermath and damage to Mr. Depp's face.   On other occasions—after Ms. Heard violently attacked Mr. Depp in December 2015—Mr. Bett insisted on taking photographs to document the damage to Mr. Depp's face inflicted by Ms. Heard.

31.     Thus, contrary to the false and defamatory implication in her "Sexual Violence" op-ed, Ms. Heard was never a victim of domestic violence at the hands of Mr. Depp.  Ms. Heard herself is a domestic abuser, who committed multiple acts of domestic violence against Mr. Depp

Exhibit C - 014

during their marriage, in addition to the domestic abuse that she perpetrated against her former
partner.

### Ms. Heard's Domestic Abuse Allegations Against Mr. Depp Are False And Have Been Refuted Conclusively By Police, Neutral Third-Party Witnesses, and 87 Surveillance Videos

32.     Ms. Heard did not "[speak] up against sexual violence" as she claimed in her op-
ed.  She made false allegations of domestic abuse against Mr. Depp to execute her hoax.

33.     The centerpiece of Ms. Heard's false abuse allegations is an incident that she
claimed took place around 7:15 pm on Saturday, May 21, 2016 at Mr. Depp's penthouse in the
Eastern Columbia Building in downtown Los Angeles.  After Ms. Heard lured Mr. Depp to pick
up personal items from his own penthouse, Ms. Heard, sitting on the sofa with her friend, Raquel
Pennington, and talking on the phone with her friend, iO Tillett Wright, claimed that Mr. Depp
"grabbed the cell phone, wound up his arm like a baseball pitcher and threw the cell phone at me
striking my cheek and eye with great force."  Ms. Heard also claimed that Mr. Depp further
battered her face with some "appendage of his body" and then used a magnum-sized bottle of
wine to destroy the penthouse, spilling wine, broken glass, and other items around the penthouse.
"Penthouse 3 was destroyed" by Mr. Depp's bottle swinging, claimed Ms. Heard in her sworn
testimony. Her two friends testified accordingly.  Ms. Heard used these allegations to obtain a
temporary restraining order against Mr. Depp on May 27, 2016, appearing in court six days after
the alleged incident with the first appearance of a battered face, notwithstanding that a litany of
people witnessed her throughout the week with no injury and building surveillance videos
similarly showed her uninjured.

34.     Mr. Depp, it is worth noting, left Los Angeles for many weeks almost
immediately after the alleged incident.  And it is also worth noting that building personnel

Exhibit C - 015

testified under oath that they again facilitated Elon Musk's nighttime visits to Mr. Depp's penthouse to visit Ms. Heard, key-fobbing him in and out of the building proximate to the time Ms. Heard presented her battered face to the public and the court on May 27, 2016.

35.    Mr. Depp has consistently and unequivocally denied Ms. Heard's domestic abuse allegations. They also have been refuted conclusively by multiple, neutral third-party witnesses.

36.    Ms. Heard's friend and neighbor, Isaac Baruch, gave a declaration that he repeatedly interacted with Ms. Heard, at close range, without makeup, and utterly unmarked and uninjured in the days between May 22 and May 27, 2016. He further stated in his declaration that on June 3, after confronting Ms. Heard about how upset he was at her false abuse allegations: "Amber then told me that she did not want anything from Johnny and that it was the lawyers who were doing all of this."

37.    Police went to Mr. Depp's penthouse on May 21, 2016, immediately after the incident was alleged to have occurred. They were dispatched after Ms. Heard's friend, Mr. Wright, called 911 to report what the police dispatch log describes as a "verbal argument only" between a husband and wife. Two officers, who are highly trained in domestic violence, arrived at the penthouse shortly after Ms. Heard later claimed that Mr. Depp struck her in the face with a cell phone, further hit her face, and then "destroyed" his own penthouse by swinging a magnum-sized bottle of wine into other objects throughout that penthouse. Officer Melissa Saenz is a veteran Los Angeles Police officer who is charged with training other police officers and personally has responded to "over a hundred" domestic violence calls. Officer Tyler Hadden is a junior police officer, but focused on domestic violence at the police academy and received extensive training in how to detect that particular crime.

Exhibit C - 016

38.     Both Officer Saenz and Officer Hadden testified under oath that they closely observed Ms. Heard's face in good light on May 21, 2016 and saw no signs of any injury. In the police officers' face-to-face interactions with Ms. Heard immediately after she supposedly was struck in the face with a cell phone and then further beaten in the face by Mr. Depp, the police officers saw no red marks, no bruising, and no swelling anywhere on Ms. Heard's face. Both Officer Saenz and Officer Hadden also testified under oath that, when they went room-to-room in the penthouses to investigate, they saw no broken glass, no spilled wine, and no vandalism or property damage of any kind. This is in contrast to Ms. Heard's later claim that Mr. Depp "destroyed" penthouse 3 and caused serious, visible injuries to her face. It also directly contradicts Ms. Heard's friend's testimony regarding what Ms. Heard's face looked like at that time: "Just the whole side of her face was like swolled up (sic) and red and puffy . . . and progressively getting worse."

39.     There was no probable cause to believe that a crime had been committed, according to Officer Saenz's testimony, because Ms. Heard had no injuries and claimed to have no injuries, and there was no property damage in the penthouse or signs of any altercation.

40.     Multiple people who work professionally in the Eastern Columbia Building where the penthouse is located, and who do not know Mr. Depp personally, also have unambiguously debunked Ms. Heard's claim that her face was injured on May 21, 2016 and that she had any sign of injury in the six days before May 27, 2016. Three people, the building's concierge, head of front desk and head of security, profoundly testified under oath about their face-to-face interactions with Ms. Heard between May 22, 2016 (the day after Ms. Heard claims that Mr. Depp hit her and struck her in the eye and on the cheek with a cell phone) and May 27, 2016 (the day Ms. Heard appeared in public and went to court to get a restraining order against Mr. Depp

13

Exhibit C - 017

with what appeared to be a battered face).  Every one of those three people testified under oath that they saw Ms. Heard up close in the days after the supposed attack and her face was not injured *before the day she obtained the restraining order against Mr. Depp*.

41.     Cornelius Harrell is a concierge at the Eastern Columbia Building and was working at the front desk at 1 pm on the afternoon of Sunday, May 22, 2016.  Mr. Harrell saw Ms. Heard face-to-face that afternoon—less than 24 hours after she claims that she was struck in the face by a cell phone thrown by Mr. Depp and hit in the face by Mr. Depp.

42.     In an interaction that was also captured by the Eastern Columbia Building's surveillance cameras and saved, Ms. Heard approached Mr. Harrell to pick up a package that had been delivered to her.  Ms. Heard accompanied Mr. Harrell to the package room to identify which package she wanted because more than one had been delivered to her.  As they were looking through her packages, Mr. Harrell and Ms. Heard were inside the package room together.  The package room at the Eastern Columbia Building is "no bigger than a walk-in closet," so Mr. Harrell had an opportunity to observe Ms. Heard's face up close, the day after she claimed she was battered by Mr. Depp in the face.

43.     Mr. Harrell testified under oath that, on May 22, 2016, Ms. Heard did not have any bruises, cuts, scratches, or swelling on her face and that "nothing appeared out of the ordinary about Ms. Heard's face on May 22, 2016."  In fact, Mr. Harrell testified that he was struck by how "beautiful," "radiant," and "refreshed" Ms. Heard looked, noting that, if she was wearing any makeup at all, it was "minimal."  Mr. Harrell unequivocally testified that when he was interacting one-on-one in close quarters with Ms. Heard on May 22, 2016 for about 8 minutes, that he did not see any evidence to suggest that she had been the victim of domestic violence the day before.  Mr. Harrell does not know Mr. Depp personally.

14

Exhibit C - 018

44.     Alejandro Romero also works at the Eastern Columbia Building, manning the front desk and monitoring the security cameras from 4:00 pm to 1:00 am Monday-Friday. Mr. Romero had "hundreds" of in-person interactions with Ms. Heard when she resided in the penthouse, in addition to observing her innumerable times on surveillance footage captured by the Eastern Columbia Building's security cameras. Mr. Romero testified under oath about two specific face-to-face interactions that he had with Ms. Heard in the days after she claimed that Mr. Depp hit her in the face and struck her cheek and eye with a cell phone that he threw.

45.     Mr. Romero testified that on the "Monday or Tuesday" evening "after the police were called"—May 23 or 24, 2016—he was approached at the front desk by Ms. Heard and her friend, Ms. Pennington, who also resided in the penthouse. Ms. Heard and Ms. Pennington asked Mr. Romero to accompany them to the penthouse because they were afraid that someone had tried to get inside the penthouse. Mr. Romero discounted this concern because he had been monitoring security footage and saw no one trying to access the penthouse. Nevertheless, Mr. Romero agreed to accompany Ms. Heard and Ms. Pennington to the penthouse and confirm that it was secure. He left the front desk with Ms. Heard and Ms. Pennington, rode up to the 13th floor with them, and went inside the penthouse with them. Throughout this interaction, Mr. Romero testified under oath that he had "a full shot" of Ms. Heard's face and "a good visual" of Ms. Heard's face and saw no bruises, cuts, swelling, or marks of any kind.

46.     Mr. Romero interacted with Ms. Heard again on the evening of May 25, 2016 when she came to the front desk to retrieve a key to the penthouse that she had left at the front desk. Again, in this face-to-face interaction, Mr. Romero testified that he saw no bruises, cuts, swelling, or marks of any kind on Ms. Heard's face.

15

Exhibit C - 019

47.     Based on his in-person interactions with Ms. Heard, Mr. Romero, who does not know Mr. Depp personally, testified under oath that he "couldn't believe" Ms. Heard's domestic abuse allegations against Mr. Depp because:

> It was like — it was like I said, we watched the news and we saw the pictures. And I saw the pictures and the next day I saw her, I was like, come on, really? I couldn't believe it. It was — I saw her in person. . . . . The pictures I saw on the news, she got like a big mark on her — on her eyes and her cheek. And when I saw her in person, I didn't see anything.

48.     Trinity Esparza, the daytime concierge at the Eastern Columbia Building who works at the front desk from 8:00 am to 4:00 pm Monday-Friday, echoed Mr. Romero's disbelief at Ms. Heard's account. Ms. Esparza, who does not know Mr. Depp personally, testified under oath that she thought that Ms. Heard's allegation that she had been assaulted by Mr. Depp was "false" because "I saw her several times [in the days after the alleged attack] and I didn't see that [mark] on her face."

49.     Ms. Esparza had multiple face-to-face interactions with Ms. Heard in the days after Ms. Heard claimed that Mr. Depp hit her and struck her in the eye and cheek with a cell phone. Ms. Esparza saw Ms. Heard in-person on Monday, May 23, 2016; Tuesday, May 24, 2016; Wednesday, May 25, 2016; and Friday, May 27, 2016. Ms. Esparza testified under oath that, when she saw Ms. Heard on the Monday, Tuesday, and Wednesday after the alleged attack, Ms. Heard was not wearing makeup and that Ms. Heard had no facial injuries. There were no bruises or cuts on Ms. Heard's face, according to Ms. Esparza's testimony. Ms. Esparza testified under oath that she saw no indication that Ms. Heard had been hit or struck.

50.     Then, on Friday, May 27, 2016, Ms. Esparza testified under oath that Ms. Heard suddenly "had a red cut underneath her right eye and red marks by her eye." Then Ms. Esparza learned from media reports that Ms. Heard had obtained a domestic violence restraining order

16

Exhibit C - 020

against Mr. Depp on May 27, 2016. Because Ms. Esparza had seen Ms. Heard so many times that week without any marks on her face, Ms. Esparza thought "the time didn't add up and so I was questioning . . . the mark on her face and the allegations that were made."

51.     Ms. Esparza was so troubled by the sudden appearance of "a mark" on Ms. Heard's face on *the very day* that Ms. Heard obtained a restraining order against Mr. Depp—but *six days after* the alleged incident—that Ms. Esparza went back and looked at security video footage and talked to others who worked in the Eastern Columbia Building to see if the "mark" might have been on Ms. Heard's face earlier. It wasn't.

52.     Mr. Romero and Mr. Harrell confirmed to Ms. Esparza that Ms. Heard did not have any injuries on her face when they interacted with her.

53.     Ms. Esparza also did not see the "mark" on Ms. Heard's face when she went back and reviewed surveillance videos from the days after Ms. Heard claims that Mr. Depp hit her and struck her in the face with a cell phone that he threw.

54.     But Ms. Esparza did see something else on the surveillance video. On a video from the evening of May 24, 2016, three nights after Ms. Heard alleged that she was attacked by Mr. Depp, Ms. Esparza saw Ms. Heard, her sister, Whitney Heard, and Ms. Heard's friend and corroborating witness, Ms. Pennington, on the mezzanine level of the Eastern Columbia Building. In the surveillance video, Ms. Esparza testified under oath that she saw Whitney Heard pretend to punch her sister in the face. Then Ms. Heard, Ms. Pennington, and Whitney Heard all laughed. Ms. Esparza testified that she thought how Ms. Heard, Ms. Pennington, and Whitney Heard were acting on the surveillance video was "wrong," and it only made her question more how Ms. Heard ended up with a "mark" on her face three days later, on Friday, May 27. Ms. Esparza knew that Mr. Depp had left Los Angeles for work on the day of the

Exhibit C - 021

alleged incident "and he did not return and so I was questioning how those marks got on her face on Friday." Ultimately, Ms. Esparza testified under oath that she was forced to conclude that "whatever happened to [Ms. Heard's] face did not happen on Saturday [May 21]", as Ms. Heard had alleged.

55.    Ms. Esparza is not the only professional employee of the Eastern Columbia Building to witness the "fake punch" video. Brandon Patterson, the General Manager of the Eastern Columbia Building, provided a declaration about it:

> One of the surveillance videos, taken the evening of Tuesday, May 24, showed Amber Heard, her sister Whitney Heard, and her friend Raquel Pennington entering the building's mezzanine. Trinity Esparza showed me a video at the front desk with a pretend punch to the face from one of Miss Heard's two companions, and the three of them laughed hard. They then enter the penthouse elevator, where Ms. Heard's face was clearly visible, there were similarly no bruises, cuts, redness, swelling visible on Ms. Heard's face.

56.    Later, in the media firestorm concerning Ms. Heard's domestic abuse allegations against Mr. Depp, Ms. Heard learned that there were media reports stating that people who worked at the front desk of the Eastern Columbia Building had seen Ms. Heard without any marks on her face, as indeed was their testimony. Mr. Patterson, the General Manager of the Eastern Columbia Building, summarized the testimony of building staff in his own declaration:

> Ms. Heard was repeatedly observed in the Eastern Columbia Building in the multiple days following the alleged assault without bruises, cuts, redness, swelling or any other injuries to her face. These observations were made by people working at the front desk at the Eastern Columbia Building who interacted with Ms. Heard in person and also saw images of her on the building surveillance cameras.

57.    Approximately a week after she made her domestic abuse allegations against Mr. Depp, Ms. Heard approached Ms. Esparza and Mr. Patterson, and asked the two of them to give a statement to Ms. Heard's "friend" at *People Magazine*. Ms. Heard wanted Ms. Esparza and Mr. Patterson "to help retract the statement that was given to the press stating that the front desk

Exhibit C - 022

had released this information [about seeing Ms. Heard with no injuries to her face] and [Ms. Heard] asked if we would clarify it and let them know that we, in fact, would never release that information on any resident." Mr. Patterson and Ms. Esparza refused to give the statement and directed Ms. Heard to the Eastern Columbia Building's lawyer.

58.    Ms. Esparza testified that she was "not comfortable" with "the statement that [Ms. Heard] was proposing that [the building] make to *People Magazine*, that the building would not have said they saw [Ms. Heard] without marks on her face" "because that would have been a lie" as "the front desk did, in fact, see [Ms. Heard] prior to Friday [May 27, 2016] without marks on her face."

59.    The people working at the front desk of the Eastern Columbia Building did not see any injuries to Ms. Heard's face because there were *no* injuries to Ms. Heard's face. Ms. Heard's allegations that Mr. Depp's battered her was a poorly executed hoax.

60.    The police officers, who responded to the penthouse on May 21, 2016 immediately after the alleged attack, saw no signs that Ms. Heard had been hit or struck by a cell phone or that a magnum-sized bottle of wine had "destroyed" the penthouse because *those things never happened.* There was no probable cause to believe a crime had been committed because *no crime had been committed* against Ms. Heard by Mr. Depp.

61.    Ms. Heard's domestic violence allegations against Mr. Depp were false, as is her portrayal of herself in her "Sexual Violence" op-ed as a domestic violence victim and her portrayal of Mr. Depp as a domestic violence perpetrator and "monster."

**Ms. Heard Acted With Actual Malice When She Implied In Her "Sexual Violence" Op-Ed That She Was A Victim Of Domestic Abuse At The Hands Of Mr. Depp**

Exhibit C - 023

62.     Ms. Heard acted with actual malice when she published her false and defamatory "Sexual Violence" op-ed and implied that she was a victim of domestic abuse at the hands of Mr. Depp.

63.     Ms. Heard knew that she was not the domestic abuse victim, but the domestic abuser.

64.     Ms. Heard knew that her domestic abuse allegations against Mr. Depp were false and that she leveled them and enlisted her friends to act as surrogates for her lies, as part of an elaborate hoax to generate positive publicity for herself.

65.     Ms. Heard also knew that her elaborate hoax worked: as a result of her false allegations against Mr. Depp, Ms. Heard became a darling of the #MeToo movement, was the first actress named a Human Rights Champion of the United Nations Human Rights Office, was appointed ambassador on women's rights at the American Civil Liberties Union, and was hired by L'Oréal Paris as its global spokesperson.

66.     Because of the past success that her false domestic abuse allegations against Mr. Depp had brought her, Ms. Heard revived the false allegations to promote her new movie.

67.     *Aquaman*, Ms. Heard's first leading role in a big-budget studio film, premiered in theatres across the United States (and in Virginia) on December 21, 2019.  The movie ended up making over $1 billion at the box office globally.

68.     Tellingly, just days before the premiere, Heard published her "Sexual Violence" op-ed with its false implication that she was a domestic abuse victim at the hands of Mr. Depp on December 18, 2019 in the *Washington Post's* online edition and on December 19, 2019 in the *Washington Post's* hardcopy edition.  The op-ed in the *Washington Post's* online edition was accompanied by a picture of Ms. Heard on the red carpet at *Aquaman's* Los Angeles premiere.

20

Exhibit C - 024

### Mr. Depp's Reputation And Career Suffer As A Result Of Ms. Heard's False And Defamatory Op-Ed

69.     As a result of Ms. Heard's false domestic abuse allegations, Mr. Depp's reputation and career sustained immense damage.

70.     Ms. Heard, an actress herself, is well aware of the negative effect that false domestic abuse allegations have on Mr. Depp's career.

71.     Mr. Depp lost roles in movies because of the false allegations that Ms. Heard made against him.   When Mr. Depp was cast in films, there were public outcries for the filmmakers to recast his roles.

72.     Mr. Depp endured the public scorn caused by Ms. Heard's false domestic abuse allegations for more than two years.   But he was weathering the storm and had a successful film release in November 2019.   In fact, that movie was still playing on screens across Virginia when Ms. Heard revived the false domestic abuse allegations by publishing her "Sexual Violence" op-ed in the *Washington Post*.

73.     The reaction to Ms. Heard's false and defamatory op-ed was swift and severe. Just two days after the op-ed appeared in the *Washington Post's* online edition, Disney publicly announced that Mr. Depp would no longer be a part of the *Pirates of the Caribbean* franchise. Mr. Depp's turn as Captain Jack Sparrow in the *Pirates of the Caribbean* films is one of Mr. Depp's most iconic roles, and generated billions of dollars for Disney.   Nevertheless, he was denied an opportunity to reprise that role immediately on the heels of Ms. Heard's false and defamatory op-ed.

### COUNT ONE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 18, 2018 OP-ED IN THE ONLINE EDITION OF THE *WASHINGTON POST*

Exhibit C - 025

74.    Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

75.    Ms. Heard published the "Sexual Violence" op-ed on the December 18, 2018. The article was published to a worldwide audience on the *Washington Post's* website.  A true and correct copy of the online edition of the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit A.**

76.    The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats.  For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light.  I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

77.    These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016.  Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

78.    These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

Exhibit C - 026

     a.   Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

     b.   Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former domestic partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp, some of which she has confessed to under oath.

79.    The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

80.    By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

81.    At the time of publication, Ms. Heard knew these statements were false.

82.    Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

83.    As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

Exhibit C - 027

84.     Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights.  Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)     awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2)      awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3)     awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4)     granting such other and further relief as the Court deems appropriate.


## COUNT TWO—DEFAMATION FOR STATEMENTS IN MS. HEARD'S DECEMBER 19, 2018 OP-ED IN THE PRINT EDITION OF THE *WASHINGTON POST*

85.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

86.     Ms. Heard published the "Sexual Violence" op-ed in the December 19, 2018 hardcopy edition of the *Washington Post*, which the *Washington Post* distributes to readers in Virginia, across the nation, and around the world.  A true and correct copy of the hardcopy edition of the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit B**.

87.     The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

24

Exhibit C - 028

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

88.    These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

89.    These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

a.    Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

b.    Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

90.    The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

Exhibit C - 029

91.     By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

92.     At the time of publication, Ms. Heard knew these statements were false.

93.     Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

94.     As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

95.     Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights. Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor and against Defendant, as follows:

(1)     awarding Mr. Depp compensatory damages of not less than $ 50,000,000, or in such additional amount to be proven at trial;

(2)     awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but not less than $ 350,000;

(3)     awarding Mr. Depp all of his expenses and costs, including attorneys' fees; and

(4)     granting such other and further relief as the Court deems appropriate.

**COUNT THREE—DEFAMATION FOR STATEMENTS IN MS. HEARD'S OP-ED WHICH HEARD REPUBLISHED WHEN SHE TWEETED A LINK TO THE OP-ED ON DECEMBER 19, 2018**

Exhibit C - 030

96.     Plaintiff repeats and re-alleges each of the foregoing paragraphs as if set forth fully herein.

97.     Ms. Heard published the "Sexual Violence" op-ed in the December 18, 2018 online edition of the *Washington Post*. The following day, Ms. Heard tweeted a link to the op-ed. A true and correct copy of Ms. Heard's tweet of the link to the "Sexual Violence" op-ed is attached hereto and incorporated by reference as **Exhibit C**.

98.     The "Sexual Violence" op-ed contained the following false and defamatory statements concerning Mr. Depp:

- "Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change."

- "Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out."

- "I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse."

- "I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control."

99.     These statements are of and concerning Mr. Depp, as he is Ms. Heard's former husband and she publicly (and falsely) accused him of domestic abuse in May 2016. Moreover, Ms. Heard intended to refer to Mr. Depp in these statements, and those who know Mr. Depp or who read the "Sexual Violence" op-ed understood these statements to be about Mr. Depp.

100.    These statements, which imply that Ms. Heard was the victim of domestic violence at the hands of Mr. Depp, are false:

27

Exhibit C - 031

    a.  Mr. Depp did not commit "domestic abuse" or "sexual violence" against Ms. Heard. Ms. Heard's allegation that Mr. Depp violently attacked her on May 21, 2016 has been refuted conclusively by police, multiple, neutral third-party witnesses, and 87 newly obtained surveillance camera videos.

    b.  Ms. Heard is not a victim of domestic violence; rather, she is a perpetrator. Ms. Heard was arrested for domestic violence against her former partner in 2009. Ms. Heard also committed multiple acts of domestic violence against Mr. Depp.

101.    The substantial danger of injury to Mr. Depp's reputation from Ms. Heard's false statements is readily apparent. Such statements would tend to so harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him.

102.    By publishing these false statements, Ms. Heard caused harm to Mr. Depp's reputation.

103.    At the time of publication, Ms. Heard knew these statements were false.

104.    Ms. Heard's false statements are defamatory *per se* because they impute to Mr. Depp the commission of a crime involving moral turpitude for which Mr. Depp, if the charge was true, could be indicted and punished. Moreover, Ms. Heard's false statements prejudice Mr. Depp in his profession as a film actor. Mr. Depp therefore is entitled to presumed damages.

105.    As a direct and proximate result of these false statements by Ms. Heard, Mr. Depp has suffered damages, including, *inter alia*, injury to his reputation, harm to his ability to carry on his profession, embarrassment, humiliation, and emotional distress, in an amount to be determined at trial.

Exhibit C - 032

106.   Ms. Heard's actions were malicious, willful, and wanton, and evidence a conscious disregard for Mr. Depp's rights.  Accordingly, punitive damages are appropriate.

WHEREFORE, Plaintiff respectfully requests that the Court enter an award in Plaintiff's favor, and against Defendant, as follows:

(1)   awarding Mr. Depp compensatory damages of not less than $50,000,000, or in such additional amount to be proven at trial;

(2)   awarding Mr. Depp punitive damages to the maximum extent permitted by the laws of this Commonwealth, but no less than $350,000;

(3)   awarding Mr. Depp all expenses and costs, including attorneys' fees; and

(4)   such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMAND

Plaintiff John C. Depp, II hereby demands a jury trial on all issues so triable.

Dated: March 1, 2019

Brittany Whitesell Biles (*pro hac vice* application forthcoming)
STEIN MITCHELL BEATO & MISSNER LLP
901 Fifteenth Street, N.W.
Suite 700
Washington, D.C. 20005
Telephone: (202) 601-1602
Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

Exhibit C - 033

Facsimile: (202) 296-8312
Email: bbiles@steinmitchell.com

Adam R. Waldman
THE ENDEAVOR LAW FIRM, P.C.
1775 Pennsylvania Avenue, N.W., Suite 350
Washington, DC 20006

███████████

Benjamin G. Chew (VSB # 29113)
Elliot J. Weingarten (*pro hac vice* application forthcoming)
BROWN RUDNICK LLP
601 Thirteenth Street, N.W.
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
Email: bchew@brownrudnick.com

Counsel for Plaintiff John C. Depp, II

30

Exhibit C - 034

# EXHIBIT A

Exhibit C - 035

The Washington Post

NewHomes guide

VISIT OUR SITE

NewHomes guide

See the bigger, better new home search experience on our new enhanced website!

VISIT OUR SITE

Opinions

# Amber Heard: I spoke up against sexual violence — and faced our culture's wrath. That has to change.



Amber Heard arrives at the premiere of "Aquaman" on Dec. 12 in Los Angeles. (Jordan Strauss/Jordan Strauss/Invision/AP)

By Amber Heard
December 18, 2018

Exhibit C - 036









**Most Read Opinions**

1 | Opinion
The most revealing insight of Michael Cohen's testimony

2 | Opinion
Trump's utterly unsurprising diplomatic debacle

3 | Opinion
The case for getting Trump's tax returns just got stronger — and more urgent

4 | Perspective
Yes, Michael Cohen's a liar and a criminal. So how come you believed him?

5 | Opinion
The Republican Senate majority is imperiled

**POST REPORTS**

Latest episode

'I'm here to tell the truth about Mr. Trump.'

▶ Listen  22:16

Unparalleled reporting. Expert insight. Clear analysis. Everything you've come to expect from the newsroom of The Post — for your ears.

# A letter to Christine Blasey F
## From Connie Chung



Listen to broadcast journalist Connie Chung read a letter to Christine Blasey Ford, acknowledging publicly for the first time that she was sexually abused.
(Kate Woodsome, Danielle Kunitz/The Washington Post)

*Amber Heard is an actress and ambassador on women's rights at the American Civil Liberties Union.*

I was exposed to abuse at a very young age. I knew certain things early on, without ever having to be told. I knew that men have the power — physically, socially and financially — and that a lot of institutions support that arrangement. I knew this long before I had the words to articulate it, and I bet you learned it young, too.

Like many women, I had been harassed and sexually assaulted by the time I was of college age. But I kept quiet — I did not expect filing complaints to bring justice. And I didn't see myself as a victim.

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year campaign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an iceberg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

Exhibit C - 037

Get the Mind Health newsletter

The Washington Post

Stories from The Lily
The Lily, a publication of The Washington Post, elevates stories about women.

Perspective
The Standing Rock protects, a cactus, and 'choosing to live': A poem in comic form

A landmark policy reversal in Congo will now allow pregnant women to receive the Ebola vaccine

As abortion restrictions increase, these 10 states are seeking a new route to access

District, Maryland and Virginia headlines and alerts
Delivered FREE to your inbox as news happens.

SIGN UP NOW

The Washington Post

Read These Comments newsletter
The best comments and conversations at The Washington Post, delivered every Friday. Join the conversation.



NEW HOMES GUIDE
The Best.
New Homes.
All In One Place.

VISIT OUR SITE

In recent years, the #MeToo movement has taught us about how power like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or simply in particular communities. In every walk of life, women are confronting these men who are buoyed by social, economic and cultural power. And these institutions are beginning to change.

We are in a transformative political moment. The president of our country has been accused by more than a dozen women of sexual misconduct, including assault and harassment. Outrage over his statements and behavior has energized a female-led opposition. #MeToo started a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elected to Congress than ever in our history, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Violence Against Women Act. First passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It improves responses by law enforcement, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

ADVERTISEMENT



LEARN MORE

Exhibit C - 038



Sign me up

washingtonpost.com
© 1996-2019 The Washington Post

Help and Contact Us
Policies and Standards
Terms of Service
Privacy Policy
Print Products Terms of Sale
Digital Products Terms of Sale
Submissions and Discussion Policy
RSS Terms of Service
Ad Choices

We should continue to fight sexual assault on college campuses, while simultaneously insisting on fair processes for adjudicating complaints. Last month, Education Secretary Betsy DeVos proposed changes to Title IX rules governing the treatment of sexual harassment and assault in schools. While some changes would make the process for handling complaints more fair, others would weaken protections for sexual assault survivors. For example, the new rules would require schools to investigate only the most extreme complaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual violence — why would we allow institutions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deeply we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

**Read more:**

The Post's View: What Betsy DeVos's new Title IX changes get right — and wrong

Betsy DeVos: It's time we balance the scales of justice in our schools

Janet Napolitano: Don't let the Trump administration undermine Title IX

Mili Mitra: The most horrifying part of the Dartmouth sexual harassment case

💬 710 Comments

Read These Comments newsletter
The best comments and conversations at The Washington Post, delivered every Friday. Join the conversation.

Sign me up

By signing up you agree to our Terms of Use and Privacy Policy

Exhibit C - 039

# EXHIBIT B

Exhibit C - 040

# The Washington Post

Mostly sunny 50/36 • Tomorrow: Cloudy, rain 50/44 B8    *Democracy Dies in Darkness*    WEDNESDAY, DECEMBER 19, 2018 · B3

*"I'm not hiding my disgust, my disdain, for this criminal offense."*
U.S. District Judge Emmet G. Sullivan



Michael Flynn, who entered court seeking no time behind bars, left needing to be of more help to prosecutors to stay out of prison.

## Judge excoriates Flynn, delays sentencing

**Ex-Trump aide forced to reiterate his crimes, warned of prison time**

BY SPENCER S. HSU, MATT ZAPOTOSKY AND CAROL D. LEONNIG

A federal judge on Tuesday postponed the sentencing for Michael Flynn after he lambasted President Trump's former national security adviser for trying to undermine the country and warned he might not spark Flynn from prison.

The stunning development means that special counsel Robert S. Mueller III's engagement with Flynn will continue for some months, leaving Flynn to wonder whether he will lose his freedom. Flynn's attorney requested the delay after the judge's opinion became apparent, hoping further cooperation with law enforcement would earn the court's mercy.

From the start, U.S. District Judge Emmet G. Sullivan made clear he was infuriated by Flynn's conduct — both in lying to the FBI while in the White House and in working to advance the interests of the Turkish government while he was a part of Trump's campaign.

The judge seemed to take particular umbrage at the FBI interview conducted by Flynn and his surrogates, just before the sentencing, that he had been duped by the FBI. Early in the hearing, Sullivan forced Flynn to admit publicly that he knew lying to the bureau was illegal and that

*Flynn* CONTINUED ON A4

### Jurist disappoints Mueller foes with a lecture on the rule of law

BY CAROL D. LEONNIG AND ROSALIND S. HELDERMAN

For a half-right minutes, U.S. District Judge Emmet G. Sullivan read aloud an inventory of Michael Flynn's lies — describing the "disgust" he felt at the "sergeant" that President Trump's national security adviser sought to deceive FBI agents while "on the premises of the White House."

Flynn, a retired general who is the highest-ranking Trump aide to plead guilty as part of the special counsel investigation, listened as he had dropped at his legal troubles.

Instead, the Trump-appointed jurist used his platform to provide complete freedom that Flynn himself bears a web of deep-state protections. And he reminded the country of a

*SULLIVAN* CONTINUED ON A4

---

# Senate passes bill revamping criminal justice

## EASES 'THREE STRIKES,' CRACK DISPARITIES

### Big pivot for GOP and a bipartisan victory for Trump

BY JOHN WAGNER AND KAROUN DEMIRJIAN

The Senate on Tuesday overwhelmingly passed a sweeping overhaul of the criminal justice system, after a remarkable political shift from Republicans who voted in large numbers to ease money by reducing prison sentences, handing a rare bipartisan victory to President Trump.

The First Step Act passed on a vote of 87 to 12, with dozens of Republicans, including longtime holdout Majority Leader Mitch McConnell (R-Ky.), joining all 49 members of the Democratic caucus to approve legislation that even some GOP supporters four could wave them vulnerable to charges of being soft on crime.

Senate Judiciary Committee Chairman Sen. Charles E. Grassley (R-Iowa) tried to allay those concerns shortly before the final vote, stressing that Trump "wants to be tough on crime, but tough on crime" — and had told him personally to sit he told his "yes ready to run this bill."

And minutes after the vote, Trump tweeted his congratulations to the Senate, stressing that his "job is to fight for ALL citizens, even those who have made mistakes."

"This will keep our communities safe and provide hope and a second chance, to those who earn it," he wrote. "As a GOP, then to everything else, fullness of dollars will be saved. I look forward to signing this into law!"

The product of years of negotiations, the legislation represents a major pivot for the GOP, which devotes aid embraced a law-and-order rallying cry and was an drug campaigns crucial to well-wing voters. But its critics noted

*FURTHER* CONTINUED ON A14

---

## President backs off demand for wall funds

**Trump seeks to avoid shutdown; short-term funding bill seems likely**

BY ERICA WERNER, DAMIAN PALETTA AND SEUNG MIN KIM

President Trump on Tuesday abandoned insistence of strident demands for Congress to give him $5 billion for his border wall, bowing to political reality as Republican scrambled to avoid shutting down large portions of the government this weekend.

It was a stunning turnaround from last week ago, when Trump told Democratic congressional leaders Carrie E. Monte conversation courting stands that he'd be "proud" to shut down the government so get his wall constructed. With a White House press secretary Sarah Sanders said Tuesday, and will identify "other ways" to fund a wall along the U.S.-Mexico border

But the president's concession, which came after lawmakers from both parties argued that his $5 billion won't plan wouldn't get through Congress, did not avert the big-pause that's been threatened.

*SHUTDOWN* CONTINUED ON A14

Blocked here they've very to mayvened for border wall. A12

A gift's dealih, Democrats release her leans and party directions. A3

---

## In light of allegations, president to shut charity

**Foundation was used for personal and political benefit, lawsuit says**

BY DAVID A. FAHRENTHOLD

President Trump has agreed to shut down his embattled personal charity and to give away its remaining money amid allegations that he used the foundation for his personal and political benefit, New York Attorney General Barbara Underwood announced Tuesday.

Underwood said that the Donald J. Trump Foundation is dissolving as her office pursues its lawsuit against the charity, Trump and his three adult children.

The suit, filed in June, alleged "extensively illegal conduct" at the charity, which Trump began in 1987. Underwood's lawsuit leaks running to seek reimbursement of $2.8 million in restitution and bars asked a judge to ban the Trumps temporarily from service on the boards of other New York nonprofit organizations.

Underwood said Tuesday that her investigation found "a shocking pattern of illegality involving"

*TRUMP* CONTINUED ON A6

---

## Inside America's other opioid epidemic

### The nation's capital is ground zero for an explosion in African American overdose deaths

BY PETER JAMISON

Spoon, whose product could be trusted, wasn't answering his phone. So just after 9 a.m. on a frigid August morning, Sam Rogers had trekked to a corner two miles east of the U.S. Capitol on Pennsylvania Avenue, hoping to find heroin that wouldn't kill him.

Now Rogers, 53, was back in his bedroom at the halfway house in Northeast D.C., fumbling for a needle. Slumped in his desk chair, he eyed a bit of the drug he just bought from a new dealer.

over his smoker and evaluate. The heroin — a tan powder said for $10 a bag — shimmered from a chunky liquid with the amber hue of ginger ale.

Palliative or poison: He would know soon enough.

"Come on," Rogers murmured, sliding a needle into his outer forearm between knots of scar tissue. A dark plume of blood rose in the barrel of the syringe.

*OPIOIDS* CONTINUED ON A10

Millions of pills in W.Va.; try but oversight had to corral in'em. A11

---

### IN THE NEWS



A league of her own: Penny Marshall, who starred in "Laverne & Shirley," then became a groundbreaking director, died at 75. B5

**THE NATION** President Trump's Federal Commission on School Safety recommended that school systems consider arming personnel and be mindful against increasing the minimum age required for gun purchases. A3 Instead, it offered devices like those used in the 2017 Las Vegas massacre will take effect next year, the Justice Department said. A3 House Speaker Paul D.

**FALLING OUT**

Runners Howell, 59, tips heroin onto her hand to spoof at her former D.C. home. She began trying it 30-plus years ago.

Backslide by veterans has surged, but the Department of Veterans Affairs has spent less than 1 percent of its budget to advertise the crisis heart-line. A16

**THE WORLD** Pakistan's implementing a plan to provide five hens and a rooster to several refugee camp families, hoping for breath-of-financial benefits. A11 The Pitcairn government has backed down on its

The United States and Mexico announced an immediate program to curb migration from Central America. A13 Syria's White Helmets, a civil defense group, is the target of a Russian disinformation campaign, a report said. A11

**THE ECONOMY** Workers who quit their jobs without paying the fine have a means of recovering penalties and pay-cutting away with it. An accident reason we're a lot from and get those who was a not view shape the Fed announcement on interest rates. A13

**THE REGION** Classic Nissan Datson, the Colonial-era living farm in McLean, will close after replacing an oversight deal. B1 A Dickens sampler proved a haunty assembler to led to a clear explanation for a hospital east of the Anacostia River to continue. B1 The D.C. Council legalized panhling on pity spaces, allowing it to advance and proved

**INSIDE**





**FOOD** Modern, Danish A Christmas dinner that's easy to prepare and full of traditional flavors. E1

**STYLE** Being a boy Three Buddhist nuns make infinite school's close middle schoolers and gender codes. C1

PostPoints
DAILY CODE: DECBA7

---

Exhibit C - 041



Leslie Moonves in July 2013. The CBS chief executive resigned in September after multiple allegations of sexual misconduct surfaced. JORDAN STRAUSS/INVISION/ASSOCIATED PRESS

## A transformative moment for women

BY AMBER HEARD

I was exposed to abuse at a very young age. I knew certain things early on, without ever having to be told. I knew that men have the power — physically, socially and financially — and that a lot of institutions support that arrangement. I knew this long before I had the words to articulate it, and I bet you learned it young, too.

Like many women, I had been harassed and sexually assaulted by the time I was of college age. But I kept quiet — I did not expect filing complaints to bring justice. And I didn't see myself as a victim.

Then two years ago, I became a public figure representing domestic abuse, and I felt the full force of our culture's wrath for women who speak out.

Friends and advisers told me I would never again work as an actress — that I would be blacklisted. A movie I was attached to recast my role. I had just shot a two-year campaign as the face of a global fashion brand, and the company dropped me. Questions arose as to whether I would be able to keep my role of Mera in the movies "Justice League" and "Aquaman."

I had the rare vantage point of seeing, in real time, how institutions protect men accused of abuse.

Imagine a powerful man as a ship, like the Titanic. That ship is a huge enterprise. When it strikes an iceberg, there are a lot of people on board desperate to patch up holes — not because they believe in or even care about the ship, but because their own fates depend on the enterprise.

In recent years, the #MeToo movement has taught us about how power, like this works, not just in Hollywood but in all kinds of institutions — workplaces, places of worship or simply in particular communities. In every walk of life, women are confronting these men who are buoyed by social, economic and cultural power. And these institutions are beginning to change.

We are in a transformative political moment. The president of our country has been accused by more than a dozen women of sexual misconduct, including assault and harassment. Outrage over his statements and behavior has energized a female-led opposition. #MeToo started a conversation about just how profoundly sexual violence affects women in every area of our lives. And last month, more women were elected to Congress than ever in our history, with a mandate to take women's issues seriously. Women's rage and determination to end sexual violence are turning into a political force.

We have an opening now to bolster and build institutions protective of women. For starters, Congress can reauthorize and strengthen the Violence Against Women Act. First passed in 1994, the act is one of the most effective pieces of legislation enacted to fight domestic violence and sexual assault. It creates support systems for people who report abuse, and provides funding for rape crisis centers, legal assistance programs and other critical services. It improves responses by law enforcement, and it prohibits discrimination against LGBTQ survivors. Funding for the act expired in September and has only been temporarily extended.

We should continue to fight sexual assault on college campuses, while simultaneously insisting on fair processes for adjudicating complaints. Last month, Education Secretary Betsy DeVos proposed changes to Title IX rules governing the treatment of sexual harassment and assault in schools. While some changes would make the process for handling complaints more fair, others would weaken protections for sexual assault survivors. For example, the new rules would require schools to investigate only the most extreme complaints, and then only when they are made to designated officials. Women on campuses already have trouble coming forward about sexual violence — why would we allow institutions to scale back supports?

I write this as a woman who had to change my phone number weekly because I was getting death threats. For months, I rarely left my apartment, and when I did, I was pursued by camera drones and photographers on foot, on motorcycles and in cars. Tabloid outlets that posted pictures of me spun them in a negative light. I felt as though I was on trial in the court of public opinion — and my life and livelihood depended on myriad judgments far beyond my control.

I want to ensure that women who come forward to talk about violence receive more support. We are electing representatives who know how deeply we care about these issues. We can work together to demand changes to laws and rules and social norms — and to right the imbalances that have shaped our lives.

*The writer is an actress and an ambassador on women's rights for the American Civil Liberties Union.*

ALYSSA ROSENBERG

*Excerpted from washingtonpost.com/people/alyssa-rosenberg*

## Pay the women instead

If there is one tiny kernel of relief in the infuriating news cyclone that has been 2018, it is the report that CBS doesn't intend to pay disgraced and disgraceful former chairman and chief executive Leslie Moonves $120 million in severance. Of course, that relief is mitigated incurring costs upfront in the form of lawyers' fees. It's a perverse incentive structure that gives companies millions of reasons not to deal aggressively with male stars who harass their co-workers.

Some companies have begun to write employment contracts specifying that employees who are axed because of sexual misconduct can't demand that

## Racism is a national security issue

BY SHERRILYN IFILL

Two newly released reports from the Senate Intelligence Committee about Russian interference in the 2016 election have been nothing short of revelatory. Both studies — one produced by researchers at Oxford University, the other by the cybersecurity firm New Knowledge — describe in granular detail how the Russian government tried to sow discord and confusion among American voters. And both conclude that Russia's campaign included a massive effort to deceive and co-opt African Americans. We have unassailable confirmation that a foreign power sought to exploit racial tensions in the United States for its own gain.

Ever since U.S. intelligence agencies reported that the Russian government worked to sway the 2016 election, foreign election meddling has been one of our nation's top national security concerns. But our discussions about Russian interference rarely touch on the other major threat to our elections: the resurgence of state-sponsored voter suppression in the United States. In light of these disturbing new reports, it is clear we can no longer think of foreign election meddling as a phenomenon separate from attempts to disenfranchise Americans of color. Racial injustice remains a real vulnerability in our democracy, one that foreign powers are only too willing to attack.

How should we respond? First, we have to make it easier, not harder, for Americans to vote. In the wake of the Supreme Court's 2013 Shelby County decision, which severely weakened the Voting Rights Act, we've seen a resurgence of voter-suppression efforts across the nation. Congress has the power to fix the Voting Rights Act, but so far it has declined to do so. The revelations of Russia's racial targeting should serve as a wake-up call that domestic voter suppression, in addition to being unconstitutional, effectively aids foreign attacks on our democracy. Indeed, we should take seriously the danger that domestic and foreign groups may coordinate to suppress turnout in future elections, a possibility we can begin to forestall, first and foremost, by protecting the franchise here at home. Rep. Terri A. Sewell (D-Ala.) has already introduced a comprehensive new voting rights bill, and Congress should swiftly act upon it in the new year.

Second, these revelations only deepen the urgency of demanding more accountability from technology companies. The New Knowledge report criticizes social media companies such as Facebook for misleading Congress about the nature of Russian interference, noting that, one even denied that specific groups were targeted. This is just more evidence that Silicon

Valley has yet to come to grips with the enormous influence it wields in our democracy, and the ways that foreign powers can use that influence to manipulate Americans. Congress should require greater transparency and responsibility from these corporations before the 2020 elections.

Finally, we have to accept that foreign powers seize upon these divisions because they are real — because racism remains in the United States' Achilles' heel. Indeed, it is, and always has been, a national security vulnerability — a fundamental and easily exploitable reality of American life that belies the image and narrative of equally and justice we project and export around the world. It may be especially difficult in our era of "fake news" and "alternative facts," but we must recognize that our failure to acknowledge hard truths, especially when it comes to race, is harder for foreign powers to turn us against one another. Russia did not conjure out of thin air the black community's legitimate grievances about racist policing. Nor did it invent racist and hateful conspiracy theories. Rather, Russian trolls seized upon these real problems as ready-made sources of discord. Moving forward, we need to recognize that our failure to honestly address issues of civil rights and racial justice makes all of us more susceptible to foreign interference.

This is hardly the first time our adversaries have identified race and racism as America's great vulnerability. During the Cold War, the Soviet Union frequently pointed to segregation and civil unrest as proof of American hypocrisy. This propaganda was sufficiently widespread, and contained enough truth, that leaders of both parties began arguing that segregation undermined the United States' position in the Cold War, helping to ease the passage of civil rights legislation in the 1950s and 1960s.

Today, we need a similar understanding that our failure to ensure equal justice for all has grave implications for U.S. national security. The upcoming House oversight committee hearings on Russian interference and voter suppression will be critical opportunities to educate the public on the threats to our democracy, and they deserve our close attention.

But we must be careful not to reduce the struggle for racial equality into a bloodless question of national interest. Civil rights are essential to our national security, but national security cannot be the chief rationale for pursuing civil rights. After all, racial injustice is not just another chink in our armor. It is the great flaw in our character. Our adversaries know that race makes us our own worst enemy. It is past time we learn this hard truth ourselves.

*The writer is president and director-counsel of the NAACP Legal Defense and Educational Fund.*

DAVID IGNATIUS

## A Russian spy's dream

I magine American politics for a moment as a laboratory experiment. A foreign adversary (let's call it "Russia") begins to play with the subjects, using errors and sticks to condition their behavior. The adversary develops tools to dial up anger and resentment inside the lab bubble, and even recruits unwitting accomplices to perform specific tasks.

This 21st-century political dystopia isn't drawn from a "spec script" that just landed in Hollywood. It's a summary of two reports on the Kremlin-linked Internet Research Agency published this week by the Senate Intelligence Committee. The studies describe a sophisticated, multilevel Russian effort to use every available tool of our open society to create resentment, mistrust and social disorder.

For a century, Russian intelligence agents have been brilliant at creating false fronts and manipulating opposition groups. Now, thanks to the Internet, they seem to be perfecting these dark arts.

Even as it meddles abroad, the Kremlin has just introduced new legislation to block its own information space from foreign penetration. Under the new law, reported this week, Russia could control all Internet and message traffic into the country, block any anonymous websites and, during a crisis, manage the Russian Web from a central command point.

Put the two halves of Russian behavior

"Russia's IRA activities were designed to polarize the U.S. public and interfere in elections," the study says, by encouraging African American voters to boycott elections, pushing right-wing voters toward extremism, and "spreading sensationalist, conspiratorial and other forms of junk political news and misinformation."

The Russians pushed every button. They sought to tap African American anger with "Blacktivist" and "Black Matters" Facebook pages. They reached conservatives through pages called "Army of Jesus," "Heart of Texas" and "Secured Borders." The list of the IRA's top-20 Facebook pages is a catalogue of American rage.

The New Knowledge report blows the cover off these Internet operations. It shows how Hillary Clinton and vice-presidential nominee Tim Kaine were depicted as the "Satan Team," with Clinton wearing devil's horns and Kaine bearing a red mark on his forehead. The researchers found an image of Jesus wearing a red "Make America Great Again" hat.

Instagram provided a useful platform for manipulating younger Americans. The IRA's "Blackstagram" account had 303,663 followers; "American Veterans" had 215,680; "Sincerely Black" had 196,764; and "Rainbow Nation" had 156,465, to name the top four Instagram pages linked to the Knowledge study.

Russia's Internet activity wasn't just

# EXHIBIT C

Exhibit C - 043

Case 2:22-cv-04685-GW-PD   Document 76-2   Filed 08/28/23   Page 44 of 45   Page ID #:1192





**Amber Heard** ✔
@realamberheard

Follow

Today I published this op-ed in the Washington Post about the women who are channeling their rage about violence and inequality into political strength despite the price of coming forward.

From college campuses to Congress, we're balancing the scales.

**Opinion | Amber Heard: I spoke up against sexual violence — and fa...**
We have an opening now to bolster and build institutions protective of women. Let's not ignore it.
washingtonpost.com

1:28 PM - 19 Dec 2018

**1,292** Retweets **3,556** Likes


💬 128    🔁 1.3K    3.6K



**Amber Heard** ✔ @realamberheard · 19 Dec 2018
I'm honored to announce my role as an @ACLU ambassador on women's rights.
The ACLU is the organization that first inspired me to become an activist, so I

Exhibit C - 044

Fairfax Circuit Court
Circuit Court
Receipt No. 827293
Receipt Date: 03/01/2019 12:49 PM

Received of:   Benjamin G Chew,                                          $      346.00

Three Hundred Forty Six and 00/100
John C Depp II   vs.   Amber Laura Heard

Filer(s): Depp, John C II

| Case | Amount |
| --- | --- |
| CL-2019-0002911 | |
| Complaint ($500,000.01 and above) | 346.00 |
| Total: | 346.00 |

Balance due court:  $          0.00
Next fine/fee due date:
Next restitution due date:

Payment Method: Check (Number: 3472)
Amount Tendered:          346.00
Overage:                       0.00
Change Due:                 0.00

John T. Frey, Clerk of Circuit Court

By: _____
    Deputy Clerk
    Clerk: ACAST5

Exhibit C - 045